**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,

Plaintiff,

v.

Cartez Lamar Cook,

Defendant.

**MEMORANDUM OPINION AND ORDER**
Criminal No. 14-221 ADM/JJK

---

Jeffrey S. Paulsen, Esq., Assistant United States Attorney, Minneapolis, MN, for Plaintiff.

Marcus L. Almon, Esq., Almon Law Office, St. Paul, MN, and Caroline Durham, Esq., St. Paul, MN, for Defendant.

---

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on Cartez Lamar Cook's Objection [Docket No. 45] to Magistrate Judge Jeffrey J. Keyes's November 17, 2014 Report and Recommendation [Docket No. 39] ("R&R"). In the R&R, Judge Keyes recommends denying Cook's Motion for Suppression of Statements [Docket No. 14] and Motion for Suppression of Unlawful Search [Docket No. 15]. After a de novo review of the record, and for the reasons stated below, Cook's Objection is overruled and Judge Keyes's R&R is adopted.

## II. BACKGROUND

Shortly after 2:00 a.m. on November 25, 2013, Minneapolis Police Officer Christopher P. Kelley and his patrol partner were on routine patrol duty on the 4400 block of Nicollet Avenue South in Minneapolis. Hr'g Tr. [Docket No. 36] 4-5. This residential neighborhood includes some businesses and a tavern, and has a high rate of street crimes such as auto theft, theft from persons, and burglary. Id. at 6. The officers were patrolling the area around bar closing time to

deter auto theft by watching for vehicles that had been started by bar patrons for warming and then left unattended as the drivers went back inside to escape the cold. Id.

The officers observed an idling Oldsmobile Alero parked on the side of the street. Id. at 7-8, 13. The car was legally parked with no apparent traffic or equipment violations. Id. at 16. When the officers first drove by the idling Oldsmobile, they could not determine whether it was occupied. Id. at 7-8. They drove around the block and approached the Oldsmobile again from the rear. Id. at 8. This time, the officers saw two occupants in the vehicle, one in the driver's seat and the other directly behind the driver. Id. at 8-9. Based on the time of night and the nature of the neighborhood, Officer Kelley decided to make contact with the occupants. Id. at 8-9.

Officer Kelley parked the squad car in the street approximately 3/4 of a car length behind the Oldsmobile. Id. at 15. The squad was offset from rather than directly behind the car. Id. Officer Kelley activated the second setting of the squad car's emergency lights, also called "wig-wag" lights, to alert the occupants that the police were behind them. Id. at 8-9. The wig-wag lights produced an alternating light pattern and the full light bar was not engaged. Id. at 8.

The officers then left their squad car and walked towards the Oldsmobile, with Officer Kelley approaching on the driver's side and his partner on the passenger side. Id. at 10. As the officers neared the Oldsmobile, Cook, who was in the driver's seat, rolled down the window. Id. at 9-10. At that point, Officer Kelley smelled a strong odor of marijuana emanating from the car. Id. at 9. Based on this odor, Officer Kelley decided to take Cook into custody and placed him in handcuffs. Id. at 10.

Immediately after Cook was handcuffed, the rear seat passenger, Curtis Leroy Johnson,

jumped over the car's console area and lunged toward Kelley's partner. Id. at 11. Kelley pushed Cook to the ground, ordered him to stay there, and went to help his partner who was struggling with Johnson. Id. at 12. As the officers were getting Johnson under control, Cook fled on foot, still in handcuffs. Id. at 12. Kelley radioed for assistance in locating Cook, and responding officers found him moments later in a gray Monte Carlo that belonged to Cook and was being driven by his girlfriend. Id. at 12-13, 21-22. Cook was then arrested. Id. at 13. He had an Apple iPhone in his possession at the time of the arrest. Id. at 22.

After Johnson was under control, Kelley observed in the Oldsmobile what he suspected to be marijuana and crack cocaine in the back seat where Johnson had been sitting. Id. at 13. The car was towed and impounded. Id. The officers obtained search warrants for the Oldsmobile, iPhone, and a DNA swab from Cook. Id. at 22-26.

At the time of his arrest, Cook was a suspect in the murder of Derrick Holt, who had been shot days earlier on November 22, 2013 in Minneapolis. Id. at 20. Holt's cell phone records showed that an hour or two before he died, Holt had been in telephone contact with the cell phone used by Cook. Id. at 21, 28-29. The last time Holt was seen alive, he was with Cook in Cook's gray Monte Carlo. Id. at 21.

A search of the Oldsmobile produced a .40 caliber handgun found on the floor under the center console in the front seat. Id. at 25. A casing found at the Holt murder scene matched the handgun from the vehicle. Id. at 24-25. The DNA on the handgun was consistent with Cook's. Id. at 26-27. The search of Cook's cell phone revealed photos of Cook and a photo of a handgun laying on a person's lap. Id. at 23.

On November 27, 2013 and December 3, 2013, Cook was interviewed by two

Minneapolis homicide detectives. Id. at 29, 32. At both interviews the Miranda advice of rights was read to Cook from a card. Id. at 29-30, 32-33. Approximately 17 minutes into the first interview, Cook asked that the recorder be turned off before engaging in further discussion. Id. at 30-31, 49-50. The remainder of the 30-40 minute interview was not recorded. Id. at 30. The entire second interview was recorded.

Cook is charged with being a felon in possession of a firearm. He has moved to suppress the evidence obtained from the search of the automobile, the iPhone, and his DNA. He argues that the evidence resulted from the officers' unlawful seizure of him without reasonable suspicion of criminal activity. Cook has also moved to suppress the statements made during law enforcement interrogations, arguing that the interrogations were not properly recorded and were therefore unlawful. Judge Keyes heard argument and testimony on the motions and issued an R&R recommending denial of both motions. Cook objects to the R&R, and requests suppression of the physical evidence and his custodial statements.

## III. DISCUSSION

### A. Standard of Review

In reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); see also D. Minn. L.R. 72.2(b). A district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

**B. Defendant's Objections**

**1. Allegedly Unlawful Seizure**

Judge Keyes concluded in the R&R that Cook was not seized for Fourth Amendment purposes at the time the officers pulled behind the parked vehicle and illuminated the squad's overhead wig-wag lights. Cook objects to this conclusion, arguing that the activation of the lights amounted to a seizure.

"Not every encounter between a police officer and a citizen constitutes an unreasonable seizure under the Fourth Amendment . . . ." United States v. Barry, 394 F.3d 1070, 1074 (8th Cir. 2005). The Supreme Court has long recognized that "[l]aw enforcement officials do not violate the Fourth Amendment by merely approaching an individual on the street . . . , by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." Florida v. Royer, 460 U.S. 491, 497 (1983). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).

In determining whether a police-citizen encounter constitutes a seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Florida v. Bostick, 501 U.S. 429, 437 (1991) (quoting Michigan v. Chesternut, 486 U.S. 567, 569 (1988)). "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." United States v. Dockter, 58 F.3d 1284, 1286 (8th Cir. 1995) (quoting Chesternut, 486 U.S. at 573). Rather than applying bright-

line rules, a court "must take into account all of the circumstances surrounding the incident in each individual case." Chesternut, 486 U.S. at 572 (internal quotation marks omitted). Circumstances that might indicate a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Mendenhall, 446 U.S. 544, 554 (1980).

Consistent with this test, courts routinely hold that where a police officer approaches an individual in a parked vehicle, the encounter does not constitute a seizure unless the circumstances would cause a reasonable person in the occupant's position to believe that he was not free to decline the officer's request. Barry, 394 F.3d at 1076-77 (listing cases); State v. Vohnoutka, 292 N.W.2d 756, 757 (Minn. 1980) ("[C]ourts generally have held that it does not by itself constitute a seizure for an officer to simply walk up and talk to a person standing in a public place or to a driver sitting in an already stopped car."). Courts also recognize that under some circumstances, an officer's conduct in pulling behind a parked vehicle and activating a squad car's flashing lights does not result in a seizure. See, e.g., United States v. Clements, 522 F.3d 790, 794-95 (7th Cir. 2008) (finding no seizure where officers used flashing red and blue lights to identify themselves before approaching parked vehicle at night); State v. Hanson, 504 N.W.2d 219, 220 (Minn. 1993) (finding no seizure where officer activated flashing red lights before approaching vehicle parked on highway shoulder at night); State v. Klamar, 823 N.W.2d 687, 692-93 (Minn. Ct. App. 2012) (same).

As Judge Keyes observed, the circumstances here are substantially similar to the police encounter in United States v. Clements, which was held not to be a seizure. See Clements, 522

F.3d at 794-95. There, officers activated their squad car's flashing lights before approaching an occupied vehicle that was parked and idling on a public street late at night. Id. at 792. The Seventh Circuit determined that the officers' actions did not constitute a seizure because the flashing lights were not used to stop the car, but were instead used

> to alert the car's occupants that they were going to approach the vehicle. Without identifying themselves appropriately to the car's occupants, the officers would have put themselves at risk in approaching a parked car late at night. Other than illuminating their flashing lights for identification and safety purposes, the officers did nothing that could have made [the defendant] feel that his freedom was restrained . . . .

Id. at 794-95.[1]

In the very similar situation here, the flashing lights were not used to stop the vehicle occupied by Cook, because the Oldsmobile was already parked before the officers came upon it. The squad car's full bar of lights was not engaged, and the siren was not activated. The wig-wag lights enabled the officers to identify themselves to the car's occupants, which was necessary because the officers were approaching a parked vehicle from behind, in the middle of the night, and in a high crime neighborhood. The officers did not exhibit conduct that would have communicated to a reasonable person that he was seized: they did not surround the vehicle with several officers, display weapons, or use threatening language. Nor did the officers block the vehicle with their squad car or otherwise prevent Cook from driving away. Indeed, the squad was parked behind and offset from the Oldsmobile. Finally, the squad was stopped in the street,

---

[1] Cook characterizes this conclusion as dicta, however the Eighth Circuit has found Clements instructive in conducting a Fourth Amendment seizure analysis. See United States v. Mabery, 686 F.3d 591, 597 (8th Cir. 2012) (comparing facts of encounter to those in Clements and holding no seizure occurred where police positioned their squad in front of a parked vehicle and activated the squad's strobe and rear emergency lights).

and thus the wig-wag lights served the further purpose of alerting other motorists of the potential traffic hazard. See Hanson, 504 N.W.2d at 220 (holding officer's actions of pulling behind a vehicle parked on a highway shoulder and activating the squad's flashing emergency lights did not constitute seizure because "[a] reasonable person would know that while flashing lights may be used as a show of authority, they also serve other purposes, including warning oncoming motorists in such a situation to be careful."). Based on all of the circumstances surrounding the encounter, a reasonable person in Cook's position would not have believed that he was seized when the officers pulled behind his car and activated the squad car's alternating lights.

Cook's arguments to the contrary are based on cases involving significantly different circumstances than those here. For example, Cook cites Michigan v. Chesternut, 486 U.S. 567, to contend that a police officer's use of flashing lights when pulling up behind a person is necessarily a show of police authority that results in a seizure. In Chesternut, a police officer on afternoon patrol drove alongside a pedestrian who began to run after seeing the patrol car. Id. at 569. The Supreme Court held that the police conduct did not constitute a seizure because the officer's actions would not have communicated to a reasonable person an attempt to capture or restrain the pedestrian. Id. at 575. In so holding, the Court noted that the police had not "activated a siren or flashers," commanded the pedestrian to halt, displayed any weapons, or attempted to block or control the pedestrian's movement with their car. Id.

The circumstances in Chesternut are materially distinguishable from those here. The Chesternut encounter took place in broad daylight, and the officer was driving alongside a moving pedestrian. In that setting, flashing lights would not have been needed for safety or identification. Had flashing lights been used, a reasonable person may have understood them as an attempt to

restrain the running person's movement. Here, Cook was already voluntarily stopped, and the officers had parked their squad car in a public street at night. A reasonable person in Cook's position would understand the officers' use of the flashing lights as a warning to other motorists and not a restraint on his liberty.[2]

Cook also erroneously relies on the Eighth Circuit's decision in United States v. Barry, 394 F.3d 1070, to argue that the activation of emergency lights is a show of authority that constitutes a seizure. In Barry, two officers on routine patrol in a high crime area observed an occupied vehicle parked late at night in an alley behind a shopping mall and stopped to "find out what was going on" and to ensure the occupants "were fine." Id. at 1072. The police parked their squad in the alley at least fifteen feet in front of the vehicle. Id. One of the officers exited the squad, shined his flashlight on his uniform to identify himself, approached the parked vehicle, and knocked three times on the passenger side window. Id. The Eighth Circuit held the officer's actions did not constitute a seizure "but instead reveal[ed] a uniformed police officer on duty cautiously approaching a parked vehicle at night, in a business alley area, to question the vehicle's occupants." Id. at 1076. In reaching this conclusion, the Court noted the officer "exhibited no show of authority, that is, he never raised his voice, he never drew his holstered weapon, he never activated his emergency lights, and he never ordered Barry to exit his vehicle." Id. at 1075.

Barry is distinguishable because the officers there approached the vehicle from the front, with the vehicle facing towards them. Here, the officers approached from the rear, with the vehicle

---

[2] The fact that Cook was already stopped when Officer Kelley activated the wig-wag lights also distinguishes this case from many others cited by Cook for the proposition that the activation of a squad car's emergency lights constitutes a seizure. See, e.g., United States v. Swindle, 407 F.3d 562 (2d Cir. 2005) (involving moving vehicle); United States v. Kerr, 817 F.2d 1384 (9th Cir. 1987) (same); Bennett v. City of Eastpointe, 410 F.3d 810, 833 (6th Cir. 2005) (involving moving bicyclists).

facing the other direction. Under these circumstances, simply shining flashlights on their uniforms would not have been sufficient for the officers to get the attention of the vehicle's occupants and make them aware of their presence and identity. Additionally, the officers in Barry parked their squad car in an alley behind a closed shopping mall, away from road traffic. Here, the squad car was parked in the street and a reasonable person would have understood that the lights, which were not fully engaged, had been activated to warn other motorists of a potential hazard. Therefore, although the activation of emergency lights might have hypothetically effected a seizure in Barry, the use of lights under the circumstances in the instant case would not communicate to a reasonable person that his liberty was restrained.

Cook further argues that he was seized when the flashing lights were illuminated because Officer Kelley testified that Cook was not free to leave at that point. See Hr'g Tr. 17. However, a police officer's subjective belief that he has detained an individual "has little or no influence on [the] Fourth Amendment analysis," which requires a court to examine the facts and circumstances from the perspective of the defendant as a reasonable person being questioned. Barry, 394 F.3d at 1075; see also Chesternut, 486 U.S. at 576 n.6 (stating a police officer's subjective intent is not relevant to a determination of whether a seizure has occurred unless that intent has been conveyed to the confronted person).

Cook also argues that a photograph of the Oldsmobile taken the next day at the police garage shows the driver's window was not rolled down. Cook thus contends that Officer Kelley would not have had the ability to smell marijuana until Cook opened the car door, which occurred at a time when he was no longer free to leave. This argument was not raised before Judge Keyes and also lacks merit. The only sworn testimony about the position of the window was that it had been rolled

down by Cook as Officer Kelley approached the vehicle. Hr'g Tr. 9. The picture taken at the police garage does not refute this testimony, as the police would naturally have rolled the window up in the process of towing the car and securing it at the police garage.

Thus, Judge Keyes properly concluded that Cook was not unlawfully seized and that suppression of the firearm and other evidence found in the vehicle is not required.

**2. Statements**

Cook also objects to Judge Keyes's recommendation that the statements obtained from Cook not be suppressed. Cook offers no basis for the objection beyond stating that the issues "are submitted on the record." Objection at 1, 14. This objection lacks the specificity required under the Local Rule. 72.2(b)(1), which states that "[a] party may file and serve <u>specific</u> written objections to a magistrate judge's proposed findings and recommendations." (emphasis added). Moreover, after reviewing the record de novo, the Court agrees with Judge Keyes's conclusion that Cook's statements were voluntarily provided and not obtained in violation of his Constitutional rights. Thus, suppression of Cook's statements is not required.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Cartez Lamar Cook's Objection [Docket No. 45] to Magistrate Judge Jeffrey J. Keyes's November 17, 2014 Report and Recommendation [Docket No. 39] is **OVERRULED**;
2. The Report and Recommendation [Docket No. 39] is **ADOPTED**;
3. Defendant's Motion for Suppression of Statements [Docket No. 14] is **DENIED**; and

4. Defendant's Motion for Suppression of Unlawful Search [Docket No. 15] is **DENIED**.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: January 15, 2015.